UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ELSA SALVADOR,                     )
        Plaintiff,                 )
                                   )
        v.                         )   C.A. No. 12-cv-30196-MAP
                                   )
LIBERTY LIFE ASSURANCE             )
COMPANY OF BOSTON and              )
MASSACHUSETTS MUTUAL LIFE          )
INSURANCE COMPANY                  )
LONG TERM DISABILITY PLAN,         )
        Defendants.                )


MEMORANDUM AND ORDER RE:
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 39 & 42)

July 28, 2014

PONSOR, U.S.D.J.

## I.  INTRODUCTION

Plaintiff Elsa Salvador brings this ERISA claim, 29
U.S.C. § 1132, to recover long-term disability benefits
against Defendants Liberty Life Assurance Company of Boston
and Massachusetts Mutual Life Insurance Company Long Term
Disability Income Plan.  On February 28, 2014, the parties
filed cross-motions for summary judgment.  For the reasons

that follow, the court will deny Plaintiff's motion and allow Defendants' motion.

II.   <u>FACTUAL BACKGROUND</u>[1]

A.   <u>The Plan</u>

The Plan grants both short-term disability (STD) and long-term disability (LTD) benefits to covered individuals who qualify as disabled.  Pursuant to the Plan, Defendants have "the authority, in [their] sole discretion, to construe the terms of this policy and to determine benefit eligibility."  (A.R. –27.)  The Plan definition of disability comprises two phases.  Within the first 24-month period, an employee is considered disabled if she "is unable to perform all of the material and substantial duties of [her] occupation" due to her injury or illness.  (A.R. –6.)  After that initial 24-month period, the individual qualifies as disabled if she cannot perform, "with reasonable continuity," the major duties of <u>either</u> her previous

---

[1]  The following facts are undisputed, <u>see</u> Fed. R. Civ. P. 56, and are drawn from the administrative record of Plaintiff's claim history, submitted under seal by Defendants.  (Dkt. No. 27 (sealed).) Reference to the administrative record throughout this memorandum is made as "A.R. —xx."

occupation or "any other occupation for which [she] is or becomes reasonably fitted." (Id.)

The policy provides LTD benefits for both physical and mental illness and defines the latter as "mental, nervous or emotional diseases or disorders of any type." (A.R. -17.) However, the Plan contains a coverage limit for mental illnesses. The provision provides that the LTD benefit for disability due to "Mental Illness and Alcohol or Drug Abuse will not exceed 24 months" unless the covered individual is in a hospital or institution at the end of the 24-month period. (A.R. -17.) The LTD benefit continues for the duration of any in-patient treatment due to mental illness and ceases thereafter. (Id.)

B.    Plaintiff's Initial Claim for LTD Benefits

On July 14, 1980, Plaintiff began working for Massachusetts Mutual Life Insurance Company ("MassMutual"). As an employee, Plaintiff was eligible for LTD coverage which she obtained from Defendant Liberty, effective as of January 1, 2000. On June 10, 2009, Plaintiff suffered a severe nervous breakdown at work in front of her colleagues and supervisor. The next day, she put in a claim for STD

3

benefits, stating that she was unable to work due to depression, anxiety, post-traumatic stress disorder (PTSD), and obsessive compulsive disorder (OCD) involving work-related stress, as well as chronic back pain.  Plaintiff received STD benefits from June 18 through December 9, 2009.

Thereafter, Plaintiff applied, and was approved, for LTD benefits, effective December 10, 2009.  The letter awarding Plaintiff her LTD benefits did not reference the Plan's mental health limitation. (A.R. -998-99.)  Around this time, Plaintiff also successfully negotiated a return to work part-time with MassMutual, which she notified Defendants of in November 2009.  Accordingly, from January 11 to April 10, 2010, Plaintiff simultaneously worked on a part-time basis and received her LTD benefit payments, less an offset for the compensation she received for her part-time work.

After awarding Plaintiff LTD benefits, Defendants also put her in touch with a law firm to assist her in applying for Social Security disability benefits.  On May 26, 2010, Plaintiff was awarded Social Security disability benefits.

The parties dispute whether Plaintiff's initial claim for LTD benefits was solely based on her mental health conditions, as Defendants assert, or whether Plaintiff also included her back problems as a basis for disability, which Plaintiff asserts. Regardless, the claims history indicates that, while Defendants initially focused their inquiry into Plaintiff's claim on her depression, PTSD, and anxiety, they later looked into her back problems. (A.R. –771-73.)

By letter dated October 12, 2011, Defendants notified Plaintiff of the 24-month limitation on LTD benefits awarded for mental illness. (A.R. –726.) Between August and November 2011, Defendants investigated Plaintiff's claim for LTD benefits. They requested and received updates from Plaintiff's chiropractor and orthopedic physician, and referred her claim to a consulting physician. After reviewing Plaintiff's claim, Defendants determined that, though Plaintiff was completely disabled due to her mental illness, her physical ailments did not meet the definition of disability under the policy. Accordingly, the 24-month mental illness limitation applied, and Plaintiff's LTD payments would end.

Defendants notified Plaintiff of this decision by letter dated November 14, 2011. (A.R. -713.) Erroneously, the letter stated that her condition met the definition of "non-verifiable," a separate provision of the policy.[2] (Id.) Moreover, Defendants incorrectly calculated the appeal deadline date they gave her in the letter; they used the date of the letter notifying Plaintiff of the termination of benefits instead of the date the benefits were actually terminated. (A.R. -714.) After Plaintiff brought this to Defendants' attention, they corrected the error by letter on February 8, 2012, and told Plaintiff she had until June 7, 2012, to submit her materials for appeal. (A.R. -634-35.) The letter also informed Plaintiff of her right to request a review of the decision by an Appeals Review Unit and that she should submit all the documentation relevant to her disability for the review.

On December 9, 2011, when Plaintiff reached the 24-month mental illness limitation, Defendants ceased their LTD payments to her. (A.R. -71.) On January 29, 2012,

---

[2] Defendants assert that this was simply a scrivener's error. Plaintiff contends that this is evidence that Defendants intended to deny her claim any way they could, which evidences the unfairness of their process.

Plaintiff notified Defendants of her intent to appeal the loss of benefits.

C.   Plaintiff's Medical Background

    1.   Mental Disability

On June 10, 2009, Plaintiff had a nervous breakdown and went on STD leave.  On January 20, 2010, Plaintiff's social worker, Michele Critelli, LICSW, sent a letter to Defendants recommending that Plaintiff begin a structured dialectical behavior therapy program.  (A.R. –972.)  On January 29, 2010, Plaintiff's psychotherapist, Piyush Johari, MD, also recommended dialectical behavior therapy to treat Plaintiff's diagnoses of depression, PTSD, and severe anxiety.  (A.R. –973.)  In response to his letter, Defendants sent Dr. Johari a questionnaire, in which he confirmed Plaintiff's diagnoses of major depression, generalized anxiety, PTSD, irritable bowel syndrome, hyperthyroidism, and work stress.  (A.R. –960-65.)

Defendants also asked Plaintiff to participate in an independent psychiatric examination through MLS Group of Companies, Inc., to which she agreed.  On March 23, 2010, Dr. Marvin Zelman conducted a three-hour examination.

Additionally, around this time, Defendants hired New England Risk Management to provide surveillance on Plaintiff.  Dr. Zelman prepared a report of Plaintiff's mental condition, for which he reviewed the surveillance account, the medical records provided by Plaintiff, and his own examination notes.  (A.R. –948-54.)  Dr. Zelman concluded that the medical evidence supported Plaintiff's primary diagnosis of major depression, that she was unable to return to work as a supervisor or function in a normal work setting with co-workers, and that her prognosis was "quite unfavorable." (A.R. –953-54.)

### 2.  Physical Disability

Plaintiff also experienced physical impairments during this time period.  Plaintiff's records from an August 2, 2011, visit with her chiropractor, Dr. George Langlitz, show that she complained of moderate buttock pain, mild low back pain, and minimal neck and back pain, with worsening symptoms.  (A.R. –781.)  On August 10, 2011, Plaintiff reported in a questionnaire that she had to adjust her sitting when her coccyx bone began to hurt, that she required a break from sitting every hour or so, and that

standing or walking for long periods hurt her mid and lower back. (A.R. -772.) Further, Plaintiff expressed her belief that both her mental and physical problems prevented her from working. (A.R. -773.)

Based on these reports, in October 2011, Defendants referred Plaintiff's claim to a consulting physician, Dr. Gary Ierna, a board-certified chiropractor. Dr. Ierna reviewed Plaintiff's file and concluded that her physical condition did not prevent her from working an eight-hour day because he could find no support for any "functional impairment from a musculoskeletal perspective." (A.R. -738.) He noted that, for the most part, the evidentiary support for her physical symptoms was her own subjective report of symptoms with little else. (A.R. -739.) Accordingly, Dr. Ierna found Plaintiff capable of returning to work. (A.R. -738.) Nonetheless, in light of her reports of pain, he also concluded that certain restrictions and limitations on work were appropriate: "From 6/6/11 through 9/30/11: Limit prolonged sitting, standing and walking to one hour and allow for 5 minute change of position for comfort (i.e. Sit to stand, etc.); Limit lifting, pushing,

pulling, and carrying to 25[pounds]; and Limit repetitive bending stooping, and squatting to comfort." (A.R. -739.)

On October 5, 2011, Dr. Ierna requested more information from Dr. Langlitz, which arrived the following day. Those documents provided notes from Plaintiff's office visits from August through September 2011 and contained substantially similar findings as those previously provided. (A.R. -728-35.)

On October 13, 2011, Plaintiff reported that she was seeing an orthopedic physician, Dr. Scott Cowan. On November 1, 2011, Dr. Cowan indicated on a form that Plaintiff could return to work On November 7, 2011, with certain restrictions: no lifting more than 20 pounds, limited pushing and pulling of weights up to 50 pounds, and occasional bending, twisting, stooping, and kneeling. (A.R. - 718-19.) Notably, he did not restrict Plaintiff with respect to standing, walking, or sitting. (A.R. -719.) In treatment notes dated November 22, 2011, Dr. Cowan wrote that Plaintiff should be limited to sedentary work until her next follow-up appointment. (A.R. -237.)

On April 25, 2012, Plaintiff underwent a three-hour

functional capacity evaluation, conducted by Angela Menard, OTR/L. Ms. Menard concluded that Plaintiff demonstrated an ability to function in an eight-hour work day at the sedentary physical demand level, as defined by the Department of Labor. (A.R. -412.) On May 7, 2012, David Bledsoe, OTR/L, reviewed Ms. Menard's report and opined that Plaintiff's ability to sit frequently could range from 2.5 hours to 5 hours. Further, Mr. Bledsoe concluded that Plaintiff's frequent need for breaks and to change positions "may interfere with any sustained sitting" at work. (A.R. -426.)

On May 11, 2012, James T. Parker, M. Ed., CRVP, compiled a vocational assessment report. (A.R. -124-30.) In doing so, he conducted a phone interview with Plaintiff and reviewed Plaintiff's medical records from Langlitz, as well as the reports from Ierna, Menard, and Bledsoe. Mr. Parker concluded that Plaintiff was totally disabled from all work for which she could reasonably qualify by education, training, and experience. Moreover, Plaintiff would remain so for the foreseeable future. (A.R. -130.)

Finally, between April 12 and August 21, 2012,
Plaintiff saw Dr. Langlitz many times.  On an April 2012
document, Dr. Langlitz noted that Plaintiff could only work
on a regular and sustained basis for a maximum of "1 [hour]
with breaks," (A.R. –139), and that her pain levels were to
"such a degree as to cause distraction from task and total
abandonment of task."  (A.R. –140.)  On April 23, 2012, in a
case review, Dr. Langlitz observed that Plaintiff's
"prognosis for a full and complete recovery is poor."  (A.R.
–134.)  In August 2012, after reviewing the functional and
vocational capacity assessments, Dr. Langlitz affirmed his
conclusion that Plaintiff's prognosis for recovery was poor.
(A.R. –243.)  However, in each of his office notes between
April and August of 2012, Dr. Langlitz indicated that
Plaintiff's prognosis was fair. (A.R. –246, 247, 249, 252,
254, 256, 258, 260, 261, 263, 266, 268, 270, 272, 274, 276,
278, 280, 282, 284, & 285.)

In October 2012, Defendants obtained an independent
review of Plaintiff's file.  On October 18, 2012, Dr. Mark
Kaplan, MD, provided his initial report based on Plaintiff's
claim file.  (A.R. –500-07.)  Dr. Kaplan found that the

medical record supported the following physical impairments: thyroid dysfunction, chronic myofascial pain with multilevel spinal segmented dysfunction, cervical and lumbar spondylosis, and coccygodynia. (A.R. –505.) He determined that the severity of these impairments warranted certain restrictions and limitations: allow position changes as needed and provide an ergonomic workstation with appropriate seating surface. (Id.) Finally, with respect to Plaintiff's physical limitations alone, Dr. Kaplan concluded that "the available information supports the ability to sustain a full time capacity within the above identified restrictions and limitations." (A.R. – 506.)

After receiving the CD-ROM for her appeal from Plaintiff on October 26, 2012, which contained additional medical records, including imaging results and the functional and vocational capacity evaluations, Dr. Kaplan re-reviewed Plaintiff's claim file. (A.R. –106-11.) He modified his original conclusion to include the restriction that Plaintiff was only able to work at a sedentary physical demand level capacity. (A.R. –110.) Dr. Kaplan determined that Ms. Menard's functional capacity evaluation was

reliable, despite some inconsistencies, and that its results were therefore "considered valid and supported by the documentation provided." (A.R. -110-11.) Thus, in addition to the restrictions and limitations he listed earlier, Dr. Kaplan added that Plaintiff should be permitted to change positions between sitting, standing, and walking as needed.

On November 14, 2012, Jason E. Miller, Ed. M, CRC, Board Certified Vocational Expert, provided a report to Defendants, analyzing Plaintiff's transferrable skills. (A.R. -87-93.) Mr. Miller determined, based on Plaintiff's training, education, experience, age and physical and mental capacity, that she could perform eight different types of occupations including her current occupation as a claims supervisor.[3] (A.R. -90.) In his report, Mr. Miller specifically responded to eight separate concerns expressed by Plaintiff's vocational expert, Mr. Parker. (A.R. -90-92.) Contrary to Mr. Parker's opinion, Mr. Miller concluded that Plaintiff could perform sedentary work, including her previous position with MassMutual.

---

[3] Those positions were claim supervisor, claim examiner, customer service supervisor, customer service representative, insurance clerk, office manager, and dispatcher. (A.R. -90.)

D.  **The Claim Appeals Process**[4]

In response to a request for documents contained in
Plaintiff's January 29, 2012, appeal letter, Defendants
reminded Plaintiff of the 180-day deadline for submitting
her appeal; that deadline was May 11, 2012.  On May 11,
2012, Plaintiff sent Defendants a fax containing her appeal
and indicating that she would send a hard copy of the letter
along with a CD-ROM containing Plaintiff's medical evidence.
Plaintiff also challenged Defendants' calculation of the
appeals' deadline.  (A.R. –610-33.)  As mentioned earlier,
Defendants had miscalculated the deadline, which they
acknowledged.  Thus, Defendants notified Plaintiff that she
actually had until June 7, 2012, to submit the remaining
materials.  (A.R. –38 (phone note 71).)

On June 14, 2012, Defendants sent Plaintiff a letter
repeating the rationale behind the initial denial (again
including what they contended was a scrivener's error
regarding a "non-verifiable" condition) and notifying her
that she had an additional forty-five days to submit
materials for her appeal.  (A.R. –565-68.)  This extended

---

[4]  Plaintiff was represented by counsel throughout her appeal
process with Defendants.

15

the deadline to August 6, 2012.  On June 27, 2012, Defendants asked Plaintiff whether she had any additional information to provide.  On August 6, 2012, Plaintiff provided more information from her chiropractor.  Defendants began processing Plaintiff's administrative appeal and notified her by letter dated August 8, 2012, that her claim had been sent to the Appeals Review Unit.  (A.R. –561.) That letter contained yet another error: it listed the general health plan's time frame of 60 to 120 days for review instead of the disability claims' more-limited time frame of 45 to 90 days.

By letter dated September 12, 2012, Defendant notified Plaintiff that they had never received the CD-ROM referenced in the May 11, 2012, fax.  (A.R. –555.)  Defendants requested that Plaintiff provide it by September 21, 2012. On October 19, 2012 -- 41 days after Defendants' requested date – Plaintiff provided the CD-ROM, which contained medical evidence generated <u>after</u> the May 11, 2012, letter. (A.R. –122.)  For example, it contained medical records from Plaintiff's chiropractor dated from July 23 to August 21, 2012.

On November 13, 2012, Plaintiff filed her complaint, later amended on March 6, 2013.  (Am. Compl., Dkt. No. 4.)  Defendants were still conducting their review at the time the complaint was filed.  On November 28, 2012, Defendants notified Plaintiff that, after reviewing her claim, they would not alter their original decision.  (A.R. -74-86.)  The letter stated the basis for their decision, including the opinions relied on and the documents reviewed.  Jonathan Bareham, an Appeal Review Consultant, signed the notification letter.

Plaintiff's complaint contains three counts against Defendants: count one to recover her benefits and enforce her rights to future benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B); count two to enjoin Defendants from enforcing the Plan's one year limitations period for commencing an action; and count three for an award of attorney's fees and costs, pursuant to § 1132(g).  On February 28, 2014, Defendants and Plaintiff filed cross-motions for summary judgment.  (Dkt. Nos. 39 & 42.)  After oral argument on April 22, 2014, the court took the matter under advisement.

III.  <u>DISCUSSION</u>

Pursuant to Rule 56, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.  On cross-motions, the court should address each motion separately and draw inferences against each movant successively.  <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997).

Both parties have moved for summary judgment on all counts.  Ultimately, the court will rule in Defendants' favor and find that their decision was not arbitrary and capricious, that Plaintiff's claim to reform the Plan's one-year limitation is not ripe for adjudication, and that there is no basis to award attorney's fees and costs.  The court will now address the arguments aimed at each count in turn.

A.   <u>Count One: 29 U.S.C. § 1132(a)(1)(B)</u>

Plaintiff's first claim is to recover her benefits and enforce her rights to future benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B).  She contends that issues with Defendants' process justify a more skeptical review of Defendants' decision, that the Plan's disparate treatment of disabilities is not justified by its language or under

ERISA, and that the claims history contradicts Defendants'
decision.  However, given the deferential standard of review
in ERISA cases and Defendants' reasonable interpretation of
the plan language, those arguments cannot succeed.

   1.   Standard of Review

    Generally in cases involving denials of ERISA
benefits, the court conducts its examination under the de
novo standard of review.  However, where the plan grants the
plan administrator the discretionary authority to determine
benefit eligibility, the appropriate standard of review is
"arbitrary and capricious."  Leahy v. Raytheon Co., 315 F.3d
11, 15 (1st Cir. 2002).  The reviewing court must therefore
"evaluate[] the reasonableness of an administrative
determination in light of the record compiled before the
plan fiduciary."  Id. at 17-18.  Accordingly, the district
court "sits more as an appellate tribunal."  Id.

   Though Plaintiff does not appear to dispute that the
Plan grants discretionary authority to Defendants, thus
establishing the correct standard as arbitrary and
capricious, she argues that several factors are present that
justify the court's tempering of the deferential standard of

review.  First, Plaintiff contends that Defendants' appeal process violated federal regulations governing the amount of time a plan administrator can take to make a decision, along with the process it must use to ensure a full and fair review.  29 C.F.R. § 2560.503-1.  Second, Plaintiff argues that Defendants' process was tainted by two conflicts. Thus, according to Plaintiff, "the court must temper the abuse of discretion standard with skepticism commensurate with the conflict."  <u>Petrone v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson & Affiliated Cos.</u>, 935 F. Supp. 2d 278, 288 (D. Mass. 2013) (Woodlock, J.) (internal quotations omitted).

Pursuant to 29 C.F.R. § 2560.503-1(i)(3), Defendants had forty-five days to make a decision once Plaintiff appealed her case.  However, for a delay to compromise the appeals process, Plaintiff must point to evidence that this alleged delay prejudiced her in some way.  <u>Bard v. Boston Shipping Ass'n</u>, 471 F.3d 229, 240-41 (1st Cir. 2006) (stating that ERISA jurisprudence has "put a burden on the claimant to demonstrate how a plan's ERISA violations prejudiced him by affecting review of his claim").  Pursuant

to § 2560.503-1(h)(4), for Defendants' review to be considered full and fair it must be "a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." § 2560.503-1(h)(3)(ii).  Similarly, Plaintiff must show how any procedural irregularity is both serious and connected to the decision reached.  McCarthy v. Commerce Grp., Inc., 831 F. Supp. 2d 459, 488 (D. Mass. 2011).

First, Plaintiff asserts that Defendants did not notify her of the result of her May 11, 2012, appeal until November 28, 2012 -- 195 days later.  However, as Defendants correctly indicate, the delay was largely due to the parties' ongoing negotiations, in addition to Plaintiff's own delay in providing the promised CD-ROM containing her medical records.  Though Plaintiff lists May 11, 2012, as the date of appeal, the letter itself states that Plaintiff intended to submit further evidence.  (A.R. -613.) Defendants extended the May 11, 2012, appeal deadline twice,

once because of their own calculation error and again to allow Plaintiff more time to submit evidence for her appeal. Moreover, even after Defendants notified Plaintiff that they had not received the promised materials, Plaintiff took forty additional days to respond to Defendants' letter.

Given that the delay was either Plaintiff's doing or for her benefit, the court cannot conclude that it prejudiced her. Additionally, the delay was not substantial enough to warrant a departure from the arbitrary and capricious standard, nor is it enough to "call into question the integrity of the benefits-denial decision itself." McCarthy, 831 F. Supp. 2d at 488.

Next, Plaintiff asserts that the same person who denied Plaintiff's initial claim was the person who determined her appeal, again in violation of ERISA regulations. This representation, though, is not supported by the record. After Plaintiff indicated her intention to pursue an appeal, Defendants issued a revised denial letter, dated June 14, 2012, clarifying their decision to deny LTD benefits. The same person who signed the initial, November 14, 2011, denial letter, authored this letter. However, this person

was not part of the Appeals Review Unit that denied Plaintiff's appeal on November 28, 2012.  (A.R. -86.)

Finally, Plaintiff contends that Defendants' process was contaminated by two conflicts.  Defendants here are ERISA fiduciaries that both evaluate benefits claims and pay out benefits.  First, such a structural financial conflict of interest may warrant increased skepticism by the court in evaluating a defendant's decision.  <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 108 (2008)(holding that where an entity plays the dual role of both determining benefit eligibility and paying out those benefits, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits").

Second, Plaintiff takes issue with Defendants' reliance on a file-only review by a physician.  Though this is not forbidden under the regulations, courts have considered such reviews -- particularly where the physician is paid by the Plan -- as a conflict of interest to be weighed carefully in evaluating whether the Plan's decision satisfies the arbitrary and capricious standard.  <u>Calvert v. Firstar Fin.,</u>

<u>Inc.</u>, 409 F.3d 286, 292-3 & 295 (6th Cir. 2005) (finding "that the failure to conduct a physical examination -- especially where the right to do so is specifically reserved in the plan -- may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination"). Again, though the standard of review itself does not change, the court takes the conflict into account when applying the standard. <u>Id.</u> at 293; <u>Petrone</u>, 935 F. Supp. 2d at 288. As earlier, Plaintiff "bears the burden of showing that the conflict influenced [Defendants'] decision." <u>Cusson v. Liberty Life Assurance Co. of Boston</u>, 592 F.3d 215, 225 (1st Cir. 2010).

Plaintiff makes no such showing here. Defendants undertook several measures to mitigate the structural conflict: they referred Plaintiff's claim to an independent physician and used an appeals unit to review the denial of benefits that was separate from the initial claims process. Other than identifying the existence of the financial structural conflict, Plaintiff cannot point to evidence in the record showing how this affected Defendants' benefits decision in her case. As for the file-only review, it is

well-settled in this circuit that "[d]enials of benefits may

be based on review of medical records submitted by the

claimant."  Orndorf v. Paul Revere Life Ins. Co., 404 F.3d

510, 526 (1st Cir. 2005).  The possibility that a conflict

may bias a plan administrator's decision is not enough:

Plaintiff must specify evidence in the record showing how.

Plaintiff nonetheless urges the court to weigh

Defendants' conflict heavily against them given the totality

of Defendants' errors: they misrepresented that they

informed Plaintiff at the outset of her LTD payments that

there was a 24-month limit on benefits when they did not,[5]

and they violated ERISA regulations governing the appeal's

time frame.[6]  Even taking all these alleged flaws into

account, however, no evidence establishes any bias against

---

[5]  The record shows that the initial award of benefits to
Plaintiff on November 25, 2009, did not contain any
information on the mental illness limitation.

[6]  Plaintiff included two other factors in her argument for
greater skepticism: Defendants' unreasonable interpretation of
the Plan's language and their notice to Plaintiff that her
benefits were stopping due to her "unverifiable" condition.
As discussed later, the court finds Defendants' interpretation
of the Plan language reasonable.  Furthermore, there is no
evidence in the record connecting the erroneous reference to
"unverifiable condition" to Defendants' ultimate decision.
Consequently, these contentions are without merit.

Plaintiff.  Accordingly, the court will not assign

substantial weight to their existence in evaluating

Defendants' decision under the arbitrary and capricious

standard.  Cusson, 592 F.3d at 228 (deciding not to "accord

any special weight to the conflict" in its analysis of the

defendant's eligibility determination).

> 2.  The Plan's Language and Defendants' Interpretation

On the merits, Plaintiff brings two challenges.  First,

Plaintiff contends the mental health limitation as applied

by Defendants violates Massachusetts' law.  Second,

Plaintiff argues that Defendants misinterpreted that Plan

language.

Plaintiff challenges the Plan's disparate treatment of

mental and physical disabilities, arguing that under

Massachusetts' law an insurance company cannot discriminate

on the basis of disability "except where such distinction or

discrimination is based on sound actuarial principles or is

related to actual experience."  Mass. Gen. Laws ch. 175, §

193T.  According to Plaintiff, the burden is on Defendants

to show compliance with state law by producing economic risk

data that demonstrates their mental health limitation is based on sound actuarial principles.

Plaintiff is misinterpreting ch. 175, § 193T. The plain language of the law clearly applies only to "the issuance of such policy or the rates or premiums charged." In fact, in ruling on Plaintiff's discovery motion, Magistrate Judge Neiman rejected this very interpretation of the law. He correctly stated, with regard to ch. 175, § 193T: "That statute, in the court's opinion, would only prohibit Defendant from making any distinction as to the issuance of the policy at issue or the rates charged; it does not govern the contents of the policy at issue unless, perhaps, it was shown to discriminate on its face between various individuals covered by it." (Order, Dkt. No. 35.) See also, Pelletier v. Fleet Fin. Grp., Inc., CIV. 99-245-B, 2000 WL 1513711 at *4 (D.N.H. Sept. 19, 2000) (confronting this argument made under a similar New Hampshire statute and concluding that the "statutory language, however, does not limit the kind of coverage that an insurer can offer").

Next, Plaintiff argues that Defendants misinterpreted the plain language of the Plan. According to Plaintiff, the

Plan only limited LTD benefits to 24 months for individuals disabled by mental illness <u>and</u> substance or drug abuse -- not mental illness alone. If Defendants had intended LTD benefits for mental illness <u>by</u> <u>itself</u> to be limited to 24 months' duration, they should have phrased the Plan differently, for example by identifying disability due to mental illness <u>or</u> alcohol or drug abuse. Plaintiff asserts that Defendants had the ability to draft a plan that limited mental illness <u>alone</u> to a 24-month disability benefit, but have not done so here.[7] Accordingly, Defendants should be held to the language of the Plan.[8]

---

[7] Plaintiff cites the language used by Defendant Liberty in several other LTD plans, with companies such as Sony (disability due to mental illness, substance abuse or non-verifiable symptoms), Charter Communications (disability due to mental illness, substance abuse and/or non-verifiable symptoms), and Lowes (disability due to mental illness, substance abuse or non-verifiable symptoms). (Pl.s' Mem. in Supp. of Summ. J. 2-4, Dkt. No. 43.)

[8] Plaintiff also offers a cursory argument that Defendants misinterpreted the Plan's definition of disability in concluding that Plaintiff could work in a sedentary occupation with appropriate accommodations and that such error was an abuse of discretion. <u>See</u> <u>Saffle v. Sierra Pac. Power Co.</u> <u>Bargaining Unit Long Term Disability Income Plan</u>, 85 F.3d 455, 456 (9th Cir. 1996) (holding that the plan administrator abused its discretion when it interpreted the plan's definition of total disability, which was "completely unable to perform each and every duty" of the job, by added "with accommodations that could [be] made" to the job). This

This argument is unpersuasive for two reasons. First, the contention that the language only referred to a double disability, both mental illness and drug dependence, is dubious on its face. "[D]etermining the meaning of <u>or</u> in a sentence is not just a matter of declaring that the word is disjunctive. Context matters." <u>Schane v. Int'l Bhd. of Teamsters Union Local No. 710 Pension Fund Pension Plan</u>, -- F.3d --, 2014 WL 3611613 at *4 (7th Cir. July 23, 2014). 506, 521 (2010) (emphasis in original). Furthermore, the interpretation Plaintiff advocates, while helpful to her in this claim, is not compatible with the rest of that section of the Plan. <u>Schane</u>, 2014 WL 3611613 at *5 (analyzing whether the plan administrator's interpretation can be reconciled with other relevant plan provisions). To read it her way would be to limit benefits for employees who are

---

argument is not well developed by Plaintiff. Regardless, courts in this district have found it appropriate for administrators to take reasonable accommodations into account. "A claims administrator may properly consider an employer's job requirements, as they are adjusted by reasonable accommodations, in determining whether an employee is totally disabled from his occupation." <u>Bekiroglu v. Paul Revere Life Ins. Co.</u>, 223 F. Supp. 2d 361, 366 (D. Mass. 2002) (Saris, J.); <u>Tebo v. Sedgwick Claims Mgmt. Servs., Inc.</u>, 848 F. Supp. 2d 39, 58 (D. Mass. 2012) (Saylor, J.) (quoting <u>Bekiroglu</u>). The court here will follow suit.

receiving in-patient care to only those confined for <u>both</u>
Mental Illness and Alcohol or Drug Abuse.  (A.R. -17.)  In
any event, it is the plan administrator's task, not the
court's, to interpret any ambiguity.  <u>See</u> <u>Conkright v.</u>
<u>Frommert</u>, 559 U.S. 506, 512-13 (2010).

Second, and more importantly, so long as a plan
administrator's interpretation of the Plan language is
reasonable, a court must defer to that interpretation.  <u>Id.</u>
at 521 (holding that a "plan administrator's interpretation
of the plan 'will not be disturbed if reasonable'").
Whether Plaintiff's alternate interpretation is reasonable
is irrelevant: so long as Defendants' interpretation is also
reasonable, the court must accept it.  Here, Defendants'
interpretation of the Plan language is plainly reasonable.
<u>See</u> <u>Firestone v. Acuson Corp. Long Term Disability Plan</u>, 326
F. Supp. 2d 1040, 1044 (N.D. Cal. 2004) (examining plan
language exactly like the one at issue here and stating that
"it placed a specific restriction on the number of benefits
that would be paid to former employees who were disabled by
'Mental Illness' or 'Drug and Alcohol Abuse'").

3.  <u>Plan Administrator's Decision</u>

Plaintiff asserts that Defendants' decision to deny
benefits was arbitrary and capricious because their
conclusion that Plaintiff's back problems did not
incapacitate her was not reasonable or supported by the
record.  Defendants argue that the administrative record
provides substantial support for their decision and, thus,
the court must uphold their decision under the arbitrary and
capricious standard.

Preliminarily, Plaintiff argues that, in order to deny
her LTD benefits, Defendants had to ignore the Plan's plain
language, which defines disability as an inability "to
perform with reasonable continuity, all of the material and
substantial duties of his own or any occupation for which he
is or becomes reasonably fitted by training, education,
experience, age and physical and <u>mental capacity</u>."  (A.R. -6
(emphasis added).)  According to Plaintiff, this language
means that Defendants are not free to ignore her psychiatric
condition in making a disability determination.
Accordingly, the fact that they failed to take this into
account in their process for determining disability shows
how arbitrary and capricious that process was.  <u>Cf</u>. <u>Reich v.</u>

Ladish Co. Inc., 306 F.3d 519, 525 (7th Cir. 2002) (finding it arbitrary and capricious when a term, previously defined by the Plan and interpreted by the administrator to have a particular meaning, has its meaning later changed when used in a different part of the Plan without any basis in the Plan or in ERISA).

The court can quickly dispose of this argument: the term "mental capacity" in ordinary usage refers to the intellectual capacity of an individual, not to her mental health status.  See Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 66 (1st Cir. 2013) ("The provisions of an ERISA plan must be read in a natural, commonsense way.").

Next, Plaintiff argues that Defendants' determination that she could work a sedentary job was not supported by any of the medical evidence.  "According to the Social Security Administration, 'sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day.'"  Connors v. Connecticut Gen. Life Ins. Co., 272 F.3d 127, 136 n.5 (2d Cir. 2001) (internal quotations omitted) (emphasis in original).  Plaintiff

maintains that there is no evidence that Plaintiff was capable of sitting for over six hours: Dr. Langlitz found Plaintiff incapable of work; Ms. Menard found Plaintiff capable of sitting frequently, which is defined as between 2.5 and 5 hours a day; Mr. Bledsoe also found that Plaintiff could sit frequently; and Dr. Cowan stated that Plaintiff should avoid prolonged sitting or standing. Additionally, Plaintiff points to the functional capacity evaluation (FCE) by Porter as supporting the fact that she could not perform at a sedentary occupation. The opinion of Parker, a vocational expert, also justifies the conclusion that Plaintiff was incapable of sedentary work because of her inability to sit for long periods.

Plaintiff argues that Defendants' decision is in conflict with the definition of sedentary work: "As SSR 83-12 explains, an individual who 'may be able to sit for a time, but must then get up and walk for awhile before returning to sitting . . . is not functionally capable of doing . . . the prolonged sitting contemplated in the definition of sedentary work . . .'." <u>Perkins v. Barnhart</u>, 266 F. Supp. 2d 198, 207 (D. Mass. 2003) (Neiman, M.J.).

Defendants' consulting doctors did not take into account either these opinions or Plaintiff's mental health issues. Furthermore, Defendants relied on the opinion of Dr. Kaplan, who only conducted a file review and never explained why Dr. Langlitz' opinion should be ignored.

Even under the arbitrary and capricious standard, Plaintiff argues, Defendants are not free to ignore evidence that supports Plaintiff's position. Conrad v. Reliance Standard Life Ins. Co., 292 F. Supp. 2d 233, 238 (D. Mass. 2003) (finding that the contracting physician's review of the records "betray[ed] a palpable bias in favor of rejecting the claim . . . [because his] conclusions select[ed] for emphasis just one or two elements of a medical report, while ignoring additional facts and important context"). An ERISA fiduciary, in performing its duties in reviewing a claim for benefits, must "do so in an even-handed and fair-minded manner." Id. Because Dr. Kaplan failed to address the contrary evidence in the claim history, the argument runs, the court should find Defendants' decision unreasonable.

Plaintiff's arguments are unavailing as the claim history is more than adequate to support Defendants' conclusions under the arbitrary and capricious standard. First, the claim history shows that Defendants here did not ignore Plaintiff's pain: Dr. Ierna took into account Plaintiff's subjective descriptions and recommended certain limitations and restrictions for her return to work. Second, Defendants' decision to credit some doctors' opinions over others is supported by substantial evidence. Bekiroglu v. Paul Revere Life Ins. Co., 223 F. Supp. 2d 361, 365 (D. Mass. 2002) aff'd, 75 F. App'x 8 (1st Cir. 2003) ("Under the arbitrary and capricious standard, a decision to deny benefits to a beneficiary will be upheld if it was 'reasoned and supported by substantial evidence in the record,' evidence that is 'reasonably sufficient to support a conclusion.'").  Moreover, Defendants were not obligated "automatically to accord special weight to the opinions of [Plaintiff's] physician."  Medina v. Metro. Life Ins. Co., 588 F.3d 41, 46 (1st Cir. 2009).  Even where there is contradictory evidence, Defendants' decision is not arbitrary and capricious where substantial evidence supports

their conclusion. <u>Id.</u> (stating that deference does not disappear merely by virtue of the presence of contrary evidence).

Third, the opinion of Plaintiff's own physician, Dr. Cowan, as well as the first functional capacity assessment performed by Ms. Menard, Plaintiff's own consultant, support Defendants' determination. Neither individual found Plaintiff incapable of working at a sedentary level for an 8-hour work day. Plaintiff's later two consultants -- neither of whom personally examined Plaintiff -- based their conclusions on Ms. Menard's report, which was drawn from her examination of Plaintiff. Even then, Mr. Bledsoe's opinion, for example, is somewhat equivocal: "Patients [sic] need for frequent standing breaks or opportunities to change position <u>may</u> interfere with any sustained sitting in a work environment." (A.R. –426 (emphasis added).)

In sum, Defendants' decision that Plaintiff did not qualify for LTD benefits due to physical disability was not arbitrary and capricious. The claims history shows that Defendants' process was thorough, full, and fair. It was also supported by the various expert opinions, including

doctors' assessments and functional capacity evaluations submitted by Plaintiff.  Although the medical evidence supports Plaintiff's claim of back problems, Defendants' decision that the impairments do not establish limitations so severe that Plaintiff cannot perform sedentary work -- including the position she occupied before taking leave for disability is "reasoned and supported by substantial evidence."  <u>Medina</u>, 588 F.3d at 45.  Consequently, the court will allow Defendants' motion for summary judgment on count one and deny Plaintiff's motion.

B.    <u>Counts Two and Three: Reformation of the Plan and Request for Attorney's Fees</u>

Plaintiff also argues, under count two, that Defendants' LTD Plan should be reformed because it limits the time frame in which a claimant can file an action to one year, whereas Massachusetts law prohibits insurance policies from limiting periods in which to bring a suit to less than two years.  Mass. Gen. Laws ch. 175, § 22.  Defendants argue that, as they have not sought to enforce the one-year

limitation on initiating legal action against Plaintiff, her claim to enjoin them is not ripe.[9]

To determine whether an issue is ripe a court must assess whether a refusal to adjudicate will work a hardship, as well as evaluate the fitness for adjudication -- i.e. "whether the necessary factual predicate is sufficiently matured to allow a court to resolve the issue presented." See Gastronomical Workers Union Local 610 v. Dorado Beach Hotel Corp. 617 F.3d 54, 61 (1st Cir. 2010). Here, Plaintiff's claim in count two is manifestly unripe. Because Defendants have not enforced the allegedly illegitimate limitation, Plaintiff's injury is speculative. See Hightower v. City of Boston, 693 F.3d 61, 71 (1st Cir. 2012) (distinguishing between speculative injury, which makes a claim unripe, and speculative remedy to address an existing injury, which does not render a claim unripe).

Finally, Defendants argue that count three should be dismissed because Plaintiff cannot prevail on her first two counts, and thus attorney's fees and costs are inappropriate. While it is still within the court's

---

[9] Plaintiff does not address the ripeness argument.

discretion to award fees and costs, generally such awards are for the prevailing party. <u>Medina</u>, 588 F.3d at 49. As the court will dismiss counts one and two, and nothing in the record justifies departing from the standard rule, it will not award attorney's fees and costs. Thus, Defendants are also entitled to judgment as a matter of law on count three.

IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment is hereby ALLOWED (Dkt. No. 39), and Plaintiff's Motion for Summary Judgment is hereby DENIED (Dkt. No. 42). The clerk shall enter judgment for Defendants.

This case may now be closed.

It is So Ordered.


                                   <u>/s/ Michael A. Ponsor</u>
                                      MICHAEL A. PONSOR
                                      U. S. District Judge